Good morning, Your Honors. Barbara Rizzo for Appellant Kirk Meeks. I represent a client who is disabled by his physical and mental impairments. Could you pull that microphone down just a bit? Sure. Is that better? Much better. Thank you. I represent a client who is disabled by his physical and mental impairments. The Social Security Administrative Law Judge, the ALJ, failed to provide any reasons for rejecting the opinion of Mr. Meeks' treating physician, Dr. Joel Steinberg. Dr. Steinberg found that Mr. Meeks could not participate in any kind of work activities at all. The Administrative Law Judge gave no reasons for rejecting that opinion. The Administrative Law Judge also did not give any reasons for rejecting the opinion of Dr. Calvin Pahn. Dr. Pahn examined Mr. Meeks at the request of the Social Security Administration. Dr. Pahn found that Mr. Meeks could not engage in full-time work activities. He gave him a residual functional capacity assessment of less than full-time work. The Administrative Law Judge also failed to provide sufficient reasons, clear and convincing reasons for rejecting Mr. Meeks' testimony. Mr. Meeks testified that he could not participate in work activities anymore because he had trouble lifting, he had trouble walking, standing, and he could not understand directions. Assuming that we might agree with you on the credibility determination, why wouldn't we remand this to get the testimony of a vocational expert? I think if Mr. Meeks' testimony were credited as it should have been, that the judge should have found him disabled based on that testimony and based on the doctor's opinions. Also based on the testimony of Mr. Meeks' brother-in-law who testified at the hearing as well. He also rejected that testimony as well? Actually the ALJ mentioned that testimony but gave no reasons whatsoever to reject that  The Administrative Law Judge also erred as a matter of law when he relied on the medical vocational guidelines to find that Mr. Meeks was not disabled. Mr. Meeks has significant non-exertional impairments, which requires the testimony of a vocational expert. Specifically, Mr. Meeks has borderline intellectual functioning. Mr. Meeks also has the needs to sit and stand at will, to change positions at will. This is considered a non-exertional impairment. And Mr. Meeks has significant back pain, which was diagnosed by the Social Security Administration's examining physician, Dr. Pond. Because the Administrative Law Judge's opinion contains numerous errors of law, we respectfully request that this Court overturn the District Court's opinion, every menace case, for the payment of benefits. Do you want to reserve the rest of your time? Yes, that's fine. Thank you. Good morning. Shae Bond on behalf of the Commissioner of Social Security. Your Honors, I would just like to point out something that the Claims Counsel did not address in her argument is the fact that there's really no medical evidence supporting her claims. Yeah, that's something that I found a really troubling aspect of the ALJ's decision. He discounted Mr. Meeks' credibility because he didn't have a lot of medical records, but yet he did have the records from the fall when he had emergency treatment. He had one other record that documented it. And he said he didn't have money to see doctors, and he didn't really have access to health care. He had no health insurance, and they tried to go to a free clinic unsuccessfully. This is the Social Security Administration. This is the agency that's supposed to take care of people, have no other recourse. And this is someone who clearly couldn't get medical attention. I had a real problem with the ALJ using that to discredit Mr. Meeks' testimony. Well, Your Honor, there was a large gap in treatment from the time that the original accident occurred in 1996. The claim alleged she was disabled as of 2001 and thereafter. He wasn't employed, he had no money, and he had no health insurance. Correct. But I would say that although he had no health insurance, he did have the opportunity to seek out free medical treatment from a county hospital or a county clinic. Now, there was testimony from the claimant's brother-in-law stating that when they went to the clinic, that the brother-in-law actually just became impatient in the wait time. And he made some sort of comment about how Hispanics and other prioritized people are getting treatment ahead of them now, and that he got fed up and he left. I don't think that's necessarily a valid reason for not seeking treatment over a particularly nine-year period of time. Well, it shows that Mr. Meeks was dependent on someone else to get help, and that person wasn't necessarily reliable in helping him get medical treatment. But Mr. Meeks could have gone on his own to seek medical treatment. It's not clear that Mr. Meeks, there was testimony in the record that Mr. Meeks couldn't find his way out of a parking lot. That was his testimony. However, he had told the consultative examiners that he was fully able to drive. And actually, he had driven himself to both consultative examinations by himself. So to the extent that his testimony was that, or his brother-in-law's testimony was that he would get lost in a parking lot, that's really just completely unsubstantiated by any other evidence in the record. That was over time. He was having trouble with that. You don't know how he managed, just speculation, how he managed to get to these two appointments. I'm sorry, could you repeat that, Your Honor? I'm just saying that it's speculation as to how he managed to get himself. Well, actually, no, it's actually not speculation, because it's actually documented in the consultative reports where they said How he did it, how he did it, not that he did it. I don't think there's a, I think it's a distinction without a difference, because if he's able to drive himself to his appointment, I think that's completely inconsistent with him then testifying or his brother-in-law testifying that he gets confused and can't even make it out of a parking lot. If he's negotiating a motor vehicle, and that's documented in the consultative report, that's how he got to a consultative exam. I think that's completely valid as to contradict any testimony that he or his brother-in-law had that he would get so confused that he couldn't even make it out of a parking lot. I mean, I think that's documented in the record. Well, doesn't the ALJ really have an obligation to explain why he is rejecting lay witness testimony? There's an obligation to address competent lay witness testimony. Well, who's incompetent here? I would say that the brother-in-law's testimony, because he was testifying as to impairments that just simply weren't documented in the record. He was testifying as to... Looking at this entire record, this man is, what, 48 years old? Approximately. 50, right in that area. And from the very beginning, after he lost his father and is a teenager, he's taken in by this rancher. And he's given jobs to do. And everything has been a kind of like menial work all of his life. And then he has this accident and falling all these feet down to concrete and having an extremely difficult time thereafter. And it's hard to believe that the ALJ would not explain why he's rejecting all of this lay testimony so that we've got a much better flavor of what has taken place. Well, again, I would go back to the fact that the brother-in-law was testifying about impairments that no doctor had actually diagnosed. And according to UCLAW, a lay witness cannot establish an impairment. And therefore, any kind of testimony he gives regarding symptoms flowing from that particular impairment, it's harmless error if the ALJ doesn't specifically discuss, accept, reject those lay witness statements. And so the brother-in-law had been talking about vision problems. He was talking about motor function, that the brother couldn't even feed himself at one point, and that he couldn't even button clothes properly. But there's absolutely no doctor that diagnosed this claimant. You don't have to have any expert evidence on something like that. I'm sorry, could you repeat that? You don't have to have expert testimony on such activities as that or lack thereof. That's common knowledge and common sense to anybody who's observing a person who has difficulties doing this. Now, why wouldn't the ALJ specifically say, why I am rejecting this testimony of his relative? The ALJ did not give the reasons for specifically rejecting that testimony. But again, I would just direct the court to the case of Eucalop, where the ALJ also there didn't specifically accept or reject lay witness statements regarding symptoms that the lay witnesses had observed the claimant doing or experiencing. And this court found that it was harmless error for the ALJ not to discuss that evidence because, again, the underlying impairment had not been diagnosed by a doctor. Well, actually the only medical evidence shows that is in the record shows that he had spinal disc degeneration and that he had problems relating to this skull fracture that he had suffered. That's the medical evidence in the record. Correct. But there is no evidence showing, after he had that initial accident in 1996, Dr. Steinberg, when he discharged him from the clinic, found that he had absolutely no mental difficulties and he had absolutely no physical neurological problems. And that's the last treatment record is in 1996 where his own treating doctor found no abnormalities. So, you know, then you fast forward to when we had the consultative examination, which the agency sent the claimant to physical and mental consultative exams for the very reason that there's really no evidence in this case. The plaintiff has provided no evidence in this case of any impairment that's disabling. And the results of those two consultative exams, physical and mental, show that the claimant could do light work and could perform work that was simple to moderate in nature. And that is consistent with the ALJ's finding for a reduced range of light work that is simple and entry level. And, again, on those consultative examinations, the neurological findings were unremarkable . The mental findings, although establishing borderline intellectual functioning, the consultative examiner still opined that he could do work activity. It would just have to be simple to moderate in nature. And that is wholly consistent with the ALJ's RFC finding that the claimant could perform simple entry level work. So when you're looking at the medical evidence in this case, you have the claimant had an injury, according to his treating doctor. Then you have the two consults which just do not establish medical evidence suggesting a disabling functional impairment. And for those reasons, the ALJ validly rejected the claimant's allegations to the contrary. And to the extent that the brother-in-law's testimony was commenting on undiagnosed impairments, then the ALJ's harmless error for the ALJ not to specifically reject the symptom testimony. And if the court has no further questions, I would ask that you affirm the district court's decision which upheld the ALJ's decision. Do the ALJ interpret the doctor's findings after his accident as saying that it just had no effect at all on his functioning mental abilities? The ALJ did not specifically address that. You're talking about Dr. Steinberg. The ALJ did not specifically address that. And it's understandable because Dr. Steinberg's opinion was temporary in time. It related to that acute accident in 1996. And when he discharged the claimant, he had fine normal and mental function. All right. Thank you, counsel. Thank you. I'd just like to address a couple of points that opposing counsel made. Counsel stated that when Mr. Meeks was discharged from the hospital, his treating physician, Dr. Steinberg, had no problems that he was discharged with a clean bill of health. That's not entirely correct. The transcript on page number 164 is the discharge summary from the hospital after the accident. And the final diagnosis is bilateral frontal and temporal lobe contusions, nondisplaced fracture of the right humerus, surgical neck, probable old compression fracture at T12, and a skull fracture. That was the discharge diagnosis. The doctor also said in this discharge diagnosis that Mr. Meeks could not do any kind of work whatsoever. Well, that we probably have to read that as not necessarily forever. I'm sorry. Could you repeat? Don't you don't don't isn't the context of that that he shouldn't do any kind of work, you know, in the immediate future? Or, I mean, is he really saying he should never do any more work ever? I don't believe he put a time restriction on this, but Mr. Meeks had no means of seeking medical attention after he lost his job after this accident. So there are no follow-up medical reports regarding his The accident? Regarding his recovery from the accident, I should say. Yeah. Yeah. When was the reason he stopped working at the emergency shelter? He stopped working. Well, he was only working there part-time four hours a day, and he stopped working because he said he couldn't do the work anymore. He couldn't do the physical demands of the work, and he couldn't do the mental demands of the work. He had trouble following instructions. He had trouble with the lifting and carrying of things and things of that nature. His brother-in-law testified that he had to go down there and help him out with the work so he could get so Mr. Meeks could get the work done while he was there. And they eventually let him go because he was no longer able to perform the work at the emergency shelter. I'd just like to address one more issue that opposing counsel made regarding the late testimony of Mr. Percival, the brother-in-law. Mr. Percival didn't testify about medical conditions that Mr. Meeks has. He's not a doctor. He did not give medical opinion or give medical testimony. He testified about his observations of Mr. Meeks and how he observed Mr. Meeks not being able to perform these functions that are required for him to do any type of gainful employment. Did he go back to work for Mr. Collin? He went back to the ranch and he lived there because the rancher was giving him room and board and he did do some kind of limited activities for the rancher. He helped feed the animals and I think he helped to try and clean out the stalls and things of that nature. Fairly limited from what he had done previously before the accident. Yes, that's correct. And I believe that was his testimony as well. Mr. Collin sounds like a pretty decent human being, doesn't he? He does, doesn't he? If there are no more questions, I would ask that this Court overturn the District Court's decision and remand for the payment of benefits. Thank you.
judges: Canby, Wardlaw, Mills